The next case is 2008-1441, University of Pittsburgh v. Varian Medical. McKelvey, whenever you're ready. Please record. The panel has decided we do not need to hear argument in the cross appeal. We'll take the cross appeal as submitted on the record. So use your time accordingly. I will. Roderick McKelvey for the University of Pittsburgh along with Deanna Kwong and Peter Buscemi. I have four points I'd like to make. First point, with regard to the assignment, we think the assignment controls. Obviously, we said that in our briefing. And we believe the assignment assigns title to Pitt. Pitt, therefore, has standing to sue. On the waiver issue, we think that there was no waiver. These issues of the title were argued to the district court. The district court had the matters. Therefore, we think there's no waiver. On the issue of whether the dismissal was a sanction or not, we think the record's now clear that there was no sanction. On the issue of prejudice, we think there's no basis for the court to have dismissed the matter with prejudice. So I'd like to turn to the assignment, if I could, just for a minute. We think the assignment controls. That it's notice to the world as to who owns the patents. And we think it's consistent with the guidelines. We think it's consistent with the facts as to what the parties did. We think it's inappropriate for Varian to tell Carnegie Mellon and Pitt exactly what their agreement was and what the purpose of the agreement was. If you look at the cases... I don't understand that. I don't understand that. I mean, if this agreement had said, hereby assigns to Carnegie Mellon, or they'll share legal title to it, you'd lose, right? No, I don't. I'm not sure we would lose. For example, if Carnegie Mellon filed a lawsuit without the assignment, I don't think they would get very far with the lawsuit. Because I think the court would look at the patent, look at the patent office records, and say, Pitt owns the title to the patent. And that's between Pitt and Carnegie Mellon. Work it out and come back. But 261 doesn't say that you have to file with the patent office to transfer legal title. It says it's effective against third parties. But the guidelines were before the assignment and before the patent was issued. Well, but what I'm getting at is the fact that the patent office records show one thing doesn't mean that there can't be legal title in somebody else. There could be. Carnegie Mellon could have come into court to try to show that they had title, but they haven't done that. And I don't think there's any basis for them to come in and show that they do, except to the extent the guidelines. But it's not a question of Carnegie Mellon showing what the situation is. It's a question of you have to show that there is standing here so that you have the sole legal title. Right. So that's the question. And the question seems to turn on the meaning of the agreement between you and Carnegie Mellon, no? Well, correct. What about Paragraph 4 in Subsection D? All IP developed jointly, which it was here, shall be owned jointly. But then, consistent with that, the parties also agreed that one of the universities would implement the agreement. And Pitt took title to the patents. The inventors assigned the title of the patents to Pitt. Pitt and Carnegie Mellon were both aware that- Where's the documentary evidence showing that one party will take title of the patent? You just said- The assignments. Ah. The assignments. From the inventors. From the inventors. From the inventors. Where's the piece of paper that says Carnegie Mellon authorized its inventors to make the assignments? It's not in the record. Maybe they're rogue. Well, it's also not in the record that Carnegie Mellon actually controlled the IP. There's nothing in the record to show that Carnegie Mellon had the right to the patents before the inventors signed the assignments. Well, that's not the question. The question is whether, as a result of this agreement, there was a self-executing assignment of a portion of the title to the patents to Carnegie Mellon. That's the question. We have cases that talk about automatic assignments. We have cases that say the language of the agreement didn't result in an automatic assignment. The question is where this agreement falls, and the problem is that there's no prior case. I mean, each of you argues, oh, yeah, this is exactly like this case or exactly like that case. The fact is there isn't any case exactly like this, right? Exactly right. I think there's two points about that. One point is the cases, Arachnid and those other cases, have to deal with an inventor and the employer, and they're really not as controlling as a situation where you have a joint venture. What's the difference? The difference here is that there's nothing in the record that, as between the scientists and Carnegie Mellon, Carnegie Mellon controlled the right to the intellectual property. Therefore, going into the guidelines, we don't know exactly what. The record doesn't show. For example, the special master found that Carnegie Mellon never gave up the right to assign. But where is it in the record that Carnegie Mellon had the right to assign? The answer is it's not in the record. And what's in the record is that the scientists… I don't understand. I mean, you've got a situation where there's an agreement that contemplates the sharing of intellectual property rights. The question is whether that agreement was self-executing or not. Am I misunderstanding? Yes. I'm misunderstanding? I'm not misunderstanding. No, you're misunderstanding. Okay. Why? What right does Carnegie Mellon have to the intellectual property? That's not a question. That's the issue. Where does it come from? Where does it come from? From the agreement, that the argument is the agreement self-executing and gave Carnegie Mellon a share in these patents. But where did Carnegie Mellon get the right to give? That's not a question of Carnegie Mellon giving. It's a question of Carnegie Mellon getting. What did Carnegie Mellon have to give under the joint guidelines? No, it's not a question of they're giving something. It's a question of whether under the joint guidelines they got something. When the inventors assigned to Pittsburgh, the question is whether there was an automatic transfer of a portion of those rights to Carnegie Mellon. That's the issue. At the time of the assignments? Yeah, at the time of the assignments from the inventors, whether the agreement automatically transferred part of those rights from Pittsburgh to Carnegie Mellon, whether it was self-executing in that respect. That seems to be the issue. Well, and if it was, well, okay. Let's assume that we look at it from the perspective, as you said, of when the inventors assigned the title over to Pitt. The question is, what were the party's expectations at the time? One way to look is the agreement says they'll jointly own the property, jointly own the intellectual property. One other way of looking at it is to look at the letter that we've identified, the memo that says 50-50, that will put the title in Pitt's name, but the parties will own the property jointly. Another way to look at it is the inter-institutional agreement. Do you remember seeing that agreement in the record, Your Honor? That's the agreement that says Pitt owns title to the patents. Pitt has taken title to the patents, but the parties will split the proceeds as follows. So that the course of conduct after the joint... I don't think it says they took title. It says they've been awarded the patents. Correct. But with respect to the guidelines, if you read the guidelines, it's very gray in that particular area. It just says all IP developers will be owned jointly by Pitt and CMU. Right. What does that mean? What interpretation does own jointly mean? I think an analogy is my wife and I buy a car together and she takes title to it. We jointly own the car, but she has title to it. And another reason why that works... And you both can use the car. If I ask you. If she lets you. If she lets me. If I fill it up with gas. It's similar to the provision in the guidelines that say they won't create a new entity. The question is, why don't they want to create a new entity? They don't want to have a new entity have title to it, but they want to have one entity manage it. And that's why I think if you read the guidelines and you say, okay, maybe you have a question about this provision about joint ownership of the intellectual property. But you look at the conduct of the parties consistent with the agreement. And the conduct of the parties consistent with the agreement is that Pitt will have title to the property. Pitt will manage the property. Pitt will handle the negotiations. You look at the emails back and forth. I don't get that out of the policy guidelines. Pitt will have title. No, no, no. I understand. We have a situation here where there was a jointly developed project, right? Correct. So it's not developed solely by Pitt, nor was it solely developed by CMU. It was jointly developed. Correct. And so what in the policy guidelines refers to title? Where title will go. Title is not referred to there, except to the extent that it says parties will join. It isn't the only reference that says that the development jointly will be owned jointly by Pitt and CMU. Correct. And the question is whether that ownership is equitable or whether it's legal, right? Correct. I mean, you don't dispute that there's a, from an equitable standpoint, there's joint ownership of these patents, right? No, not at all. And, in fact, as we've conceded in the briefing, or actually reported in the briefing, the guidelines provide that Carnegie Mellon could step in because they control 60% of the property. They could step in and have title changed to Carnegie Mellon. Because, remember, there were five inventors, and three of the five inventors were from Carnegie Mellon. What are you talking about? What provision says that they can move in and have the title changed? There's a provision in the guideline that says that Carnegie, not the title change, but they can step in and take over management of the intellectual property in the guidelines. Okay. Management. Well, there's a difference between that and title. And we have to be very careful here because what Judge Dige just set up was an equitable legal paradigm. Right. And it's perfectly clear that the parties intend to cooperate and share, share the money, and one party will be responsible for making the licenses, but that party will listen to the other person. So there's a lot of equitable relationship going on. But what you're stuck with, why you got kicked out of court, was because it was held that you didn't have legal title by yourself. Correct. That is, we concede, we agree, that as a joint venture, they have equitable title. We have duties to respond to them and to report to them and to account to them. But also under the guidelines, because they have a 60% interest rate. Well, your argument has to be that this paragraph that the other side bombs on to and that the special master ruled on saying we own jointly, you're saying that that doesn't talk, that should be construed not to focus on legal title. Correct. It's focused on the equitable relationships and it's all on a going forward basis. And in some instances, legal title would be in one party, and in some instances it would be in the other depending on how it happened. And you look to the assignment to see how that decision was made. Correct. And the course of conduct after that, and that as I mentioned under the guidelines, Carnegie Mellon can revisit with the issue with Pitt if they'd like to. Because if they think they're not managing the property correctly, they have the right to change the management under the agreement because they have more than 50% of the ownership of the property in the sense of the equitable ownership. Would they be in a position of changing the assignment also? I think they could do that. Is there any document signed between the two institutions specifically on the issue of assignments and titles of the property aside from the guidelines and the memoranda? Aside from the guidelines and the memoranda and the assignments themselves? No, not that I'm aware of. There were draft agreements, right? Inter-institutional. Inter-institutional agreements that were never signed. Correct. Those came up in the context of license negotiations with Variant. These two universities have cooperated before, is that correct? Apparently so. Was there anything in the record about any previous events? I mean, we're trying to construe a contract here, a document, and so, of course, the dealings would be important. I'm not aware of any other. Were there any inter-institutional agreements on other deals in the record? Well, there is some testimony actually where you'll see when the inter-institutional document pops up in the record, there's testimony by Molorando. This is at the appendix 1214 where he says, when it gets to the point of a license agreement, we typically put inter-institutionals in place at that time. That's the only real reference to this being in the context of broader agreements and who would do what with who. Actually, there is, if you remember during the e-mail exchanges between the parties, and Molor said, we'll give on this one, we'll get on that one. So there is some indication that there are other agreements and other transactions that they've had. But I don't think there's enough specific agreements to say here's the situation. Now that we're about to have a happy relationship with Varian, maybe we ought to sign this thing between ourselves. Well, but I think it looks like from the pattern of facts that when they get down to the economic transaction, the licensing transaction. One other thing below, Mr. McKelvey, the special master ruling against you on the summary judgment on the ownership issue recommended to the trial judge that the trial judge allow you to join CMU. Correct. Either by reversing his earlier order or by allowing you to file a new complaint. I didn't see that you actually appealed from the denial by the court of your right to join. You can bring that up as an issue of an appeal. Are you assuming for purposes of argument that you lost on your ownership issue or did you feel that you perfected here for an appeal from the denial of the joinder? There's a couple of issues there. One is did we file... Did you raise it or not? Here. Did we raise it here? Yeah. Your problem would have been solved if the trial judge had allowed you to file a new complaint joining CMU. Correct. And he didn't let you do that. Correct. And you asked for that. And also he earlier denied your joinder motion. Correct. I didn't see that you on appeal here are charging error in those rulings by the district court judge. The failure to allow us to amend... Yeah. I would have thought that was... The part of our argument is he should have done that, that he erred in not allowing... Aren't you supposed to make them in the questions presented? Your questions presented in the statement of the issues are did they err on ownership and whether they erred in dismissing with prejudice. Right. Well, the remedy we're seeking is reversal of this decision of dismissing us with prejudice, which would allow us to refile. Assume you lose on that. Assume I lose on standing. Assume you lose on standing and assume you lose on... And we say, well, the trial judge has now told us what he meant by prejudice. He didn't mean prejudice on the merits. He meant prejudice as to the jurisdictional issue. Well, if he means prejudice with the jurisdictional issue, I take it we're not barred from refiling with Carnegie Mellon. I don't know whether you are or not. That's another case. That's on appeal now. Well, this court would certainly help the parties resolve the issue. You can't resolve that other case. I know you can't resolve that other case, but you can define what with prejudice means in the context of what you're referring to. Right, but assume I said, well, with prejudice as to the jurisdictional issue, does that mean the exact jurisdictional issue or does that mean jurisdiction overall? But assume I say, well, the dismissal with prejudice was limited to the jurisdictional issue and, therefore, I don't think it was impermissible. You'd be out of luck there. If I sustained the summary judgment on ownership, you'd be out of luck there, and I didn't see that you appeal on an abuse of discretion standard the question of whether the trial judge should allow you to do a joinder. So that's why I was asking you whether you were raising that issue. We'd like to have the court consider that issue to the extent that we didn't identify it in the briefing. We think it's subsumed in the arguments that when you get to that decision about the relationship between Rule 19 and Rule 16 that the court should have allowed us to amend. Subsumed in which issue? The ownership issue or the prejudice? Dismissal with prejudice. Actually, dismissal and then dismissal with prejudice. That is, that's the argument. Remember, the argument they made below was the patent law requires that the case be dismissed because we didn't join them at the beginning. And that's one of the findings the court made. You can reverse that finding, say that we weren't required to do it. Right, and then your argument is that if it's a necessary party, the district court has absolutely no choice, must always join you, and the district court says, you know, when I sat down an order saying when you're going to allow people to join and not join, if you get past that date, I won't let you in. With regard to that, I wanted to talk about sanctions. Well, sanctions I don't need to talk about too much. I think that issue is now off the table. They've conceded with their 28J letter that this dismissal with prejudice was not a sanction imposed by the court. One of the issues that they raised is with regard to waiver, and that is did we waive arguments in not taking an appeal from the special master's decision. Our position on that is these issues were all fairly argued before the district court judged. To the extent that they had argued waiver before, they presented that issue to the district judge, and the district judge, in not granting their relief on the argument of waiver, conceded that we had not waived the right to take an appeal from the special master's report. There's two docket items that actually have significance to this issue that are not in the appendix, docket item 278 and docket item 281. 278, if you remember, after the special master's decision, there was some initial briefing. They didn't file a motion, they filed a STIR reply brief. In that motion, they referred to our response to the special master's report as an objection. They took away their argument to say that we hadn't filed an objection to the special master's report, and then in their STIR reply brief, they argued that we had waived the right to contest the standing arguments, the standing findings by the special master, and that was before, therefore, before Judge Schwab, but he didn't grant their ruling on the waiver, so we don't think that the waiver argument applies. I haven't satisfied you on the ownership, Your Honor, have I? We'll restore three minutes of your time. Thank you very much. Good morning. My name is Matthew Poppy. I represent Varian Medical Systems. May it please the Court. The University of Pittsburgh made a knowing and calculated decision to omit the co-owner of the patents, Carnegie Mellon, as a party in order to achieve tactical litigation advantages. Oh, come on. You know, just argue the case the way you should argue it, which is there's a difficult issue here, and there's no reason to throw stones at each other. It's just not useful. Your Honor, I'm simply repeating the findings by the district court in its summary judgment order. But the question is the meaning of this agreement, and the meaning of the agreement is to be determined not on the basis of litigation tactics, but on what the agreement says and the way the parties interpret it. I'll certainly begin there, Your Honor. Before this lawsuit was filed, there was a 13-year period from 1994 until 2007, during which the University of Pittsburgh and Carnegie Mellon University repeatedly and consistently treated the patents ensued as joint property. They admit that it's joint property. They admit that. The question is whether it's equitable joint property or legal joint property. That's the question. Right, but ownership and title are treated as equivalent concepts under the law. The United States Supreme Court in the Crown Dime Toolcase used those terms interchangeably, and they're regularly used interchangeably in other cases in this court as well. I can't agree as an institution to have title to a particular patent, which is developed by the professors jointly and equivalently, let's say, that there's Institution A and Institution B, and we agree that Institution A will own the property, but we have a contract saying we will split the proceeds 50-50? You could certainly have that, and the division of proceeds is different from the concept of ownership or title, but ownership and title themselves are not separate concepts, and that's why the provision of the joint policy guidelines, which provided for joint ownership of jointly developed IP, confers legal title upon the two universities jointly. Could that be an ownership of any developed income from that property? Ownership 50-50 on that basis? The policy guidelines treat the issue of the division of proceeds separately. There's a separate section or portion of the policy guidelines that talk about how the proceeds from IP are going to be divided between them. That's separate from the Section D of the policy guidelines, which talk about ownership and say that it's- You don't think that the same ownership shares would follow from the division of the proceeds? The allocation of ownership between them of title might be dependent upon that, but the existence of joint title itself is not dependent on that. Isn't it kind of an odd thing to have an agreement that says we'll share ownership without having determined what the shares will be? It strikes me as an odd thing. Well, as we saw in this case, the allocation isn't particularly relevant until there's some reasonable likelihood that there's going to be something to allocate. For ownership, for purposes of suing and that sort of thing, even for purposes of licensing, in the title sense, it's not separated. If you and I jointly are titled on a patent, you don't have 50 percent of the right to exclude and I have 50 percent. You get to exclude half the time. If you're both on the patent, it's joint and separate. It's tenancy by the entirety. I can go out, the one holder, regardless if they made a tiny contribution. If they're named and named on the patent, they can bring all the lawsuits they want. Not if there's a co-owner. Then they have to bring in the co-owner as a party from the start of litigation. That's what we have here. We have two co-owners. They have this agreement using the same essentially- What made CMU an owner on these particular patents that are clearly in the name of KIP? What made CMU a co-owner? The way that we see these agreements, we see the assignments- Show me the data points, the factual data points that make CMU a co-owner. There are two initial data points, which are the assignments from the inventors and the policy guidelines working in tandem to transfer title, first from the inventors to Pitt and then- But the assignments go directly to Pitt. That's right. The individual interests of the inventors transfer from them to Pitt and then pursue it to the policy guidelines concurrent. The minute the inventors put their pen to paper on those assignments and transferred their personal interests to Pitt, pursuant to the pre-existing policy guidelines, a joint share of the title and the patents transferred from Pitt to Carnegie Mellon- What does it say that in the policy guidelines? The provision that jointly developed IP shall be owned jointly. Anything could be in the future. That's an agreement to agree. Couldn't that language shall be interpreted in that way? That's not how it's been interpreted in the cases. Which cases? First of all, there is this court's Speedplay case in which there was also language saying that the title is hereby assigned, but the court did not focus exclusively on that language. It also relied on the separate language that one party shall own the patents. In the Affymetrix case, it's a district court case, but the court there also had language before it which said, shall be the exclusive property- It directly involves language like this. We have cases where it says shall be assigned. We have cases where it talks about be assigned in the future. We don't know whether this was- It's not immediately clear from reading this whether this was a self-executing assignment or not. The problem that you have is that this agreement is written that the shares are to be determined in the future, and that sort of suggests that they contemplated that when the shares were determined in the future that maybe the allocation and the ownership at that point would be divided, but until then, why isn't the agreement consistent with the idea that the entity that receives the assignment from the inventors will be the legal title holder until at least some future time when there's a formal division? There is one additional relevant case, which is this court's decision from late last year in Lucent Technologies versus Gateway where the provision in question read the intellectual property rights to new work will be jointly owned. That was the exact language there, same language here, and all the parties and the court treated that language in that case as transferring title to the patents to the two parties- Did we decide the question of whether it did? Excuse me? Did we decide the question of whether it did? You say assumed. Did we decide the question in the Lucent case? The question of standing generally was decided. That particular argument was not raised because apparently everybody understood it, and this is a jurisdictional question, so it would have been the duty of the court to raise the issue if it had thought that there was a problem with that. Sometimes you miss them. In that case, you certainly didn't have a policy guideline like we've got here that shows future things to be developed in the future. But it is also relevant here how the parties treated the patents throughout their relationship, and this goes from before the- You said that earlier. Right, but you asked for data points, and there are numerous data points during that period. There is a letter or a memorandum from one of the pit inventors in 1995 at the time that they were contemplating doing the patent applications where they said that the three modes, referring to the three inventions of the patents in suit, will be declared as individual patents through pit, but with 50-50 pit CMU ownership. And in 1998, after the- Well, that could be 50-50 equitable ownership, which is what they actually in the end agreed to. I think that's assigning undue sophistication to the lay inventor. These were not lawyers talking. The person that just said that in the record, is that a lawyer or a scientist? That was not a lawyer. That was a scientist. There was a later- How would a scientist understand what we're talking about right now? Well, there was a later letter from a scientist but reviewed by a lawyer at page 504 of the record referring to- This was after the patents issued, and this letter referred to the patents as three patented technologies jointly owned by pit and CMU. And then in that same year, 1998, the two universities jointly enter into an agreement with a third-party electa, certainly reviewed by attorneys, in which they jointly decide to grant an option to take an exclusive license under the patents, which would have been unnecessary had CMU not had ownership. If it wasn't an owner, then it would have had no rights to license.  I assume that ownership necessarily connotes legal ownership as opposed to equitable ownership, right? Under the court's case law, it does connote legal- Ownership is equated with legal title. Okay, so suppose we disagree with you and we think that there can be such a thing as a separation between equitable ownership and legal ownership. Let's assume we decide that. So why shouldn't we construe this agreement as dividing equitable ownership as opposed to legal ownership? We think that under the court's decisions in Speedplay, Film Tech, the district court decision in Appymetrics, the Lucent versus Gateway decision, these cases consistently discuss a contract which assigns ownership from one party to another as dealing with legal title, not equitable title. Well, that seems to be rejecting my assumption. I'm asking you to assume that we reject that argument. We say, yes, there can be a division between legal and equitable ownership, that the use of the word ownership or property doesn't necessarily connote legal ownership. Let's assume we decide that, just hypothetically. So why is it that we should construe this particular agreement under that framework as transferring legal as opposed to equitable ownership? I believe your honor is raising the question whether there is an ambiguity in the specific language of the contract about whether ownership is referring to legal title or equitable title, and that's where you have to look at extrinsic evidence that we've offered, the course of conduct of the parties, the course of conduct in this very litigation. I'm not addressing the question of title, is it? Where does somebody address the question of legal title in that correspondence? The granting place? There's no explicit discussion of legal versus equitable title, but there's no need for Carnegie Mellon to be granting licenses under the patents to third parties if it doesn't have title. There's no need for Pitt to be asking Carnegie Mellon for negotiation. Granting licenses or being consulted? Granting licenses or being consulted about licenses that are being granted? Carnegie Mellon was a party to this agreement with ELECTA under which the two universities jointly granted to ELECTA an option to take a license under the patents, and Carnegie Mellon, in addition to Pitt, agreed not to grant licenses to any third party. Is there against the law for people to do that, for a patentee to have somebody else sign on to his license? Not at all, but it's an indication of what the parties, the two universities themselves understood their rights to do. Where is this agreement that says that Carnegie Mellon is granting the license? It is page 514 of the appendix, Your Honor. We're on 514? In section 11.2 on that page, it says the universities, which is earlier defined to be Carnegie Mellon and Pitt, hereby grant to sponsor, which is ELECTA, an exclusive option to negotiate a royalty-bearing exclusive license to the following U.S. patent applications, and it identifies the patents in suit. And then below the three ABC paragraphs, it says, during the option term, the universities, plural, shall not offer a license to the patent rights to any third party. These are different patents, right? No. These are not these patents? These are these patents. These are these patents? Yes, Your Honor. And when the case was before the special master, the University of Pittsburgh did not contend that it had sole legal title. On page 5 of its brief, it said the policy guidelines grant joint ownership. The district court decided the issue, right? Well, the special master decided the issue. Adopted the special master's decision. The district court decided the legal title issue, right? No, that issue was not presented to the district court. The district court didn't decide the legal title issue? The district court decided that Pitt lacked standing based on the special master's ruling, to which Pitt did not object. There's no indication in the order that the district court engaged in separate and distinct analysis of the legal issues. It described the special master's ruling, and it says the court adopts the special master's ruling. No further discussion of that. It then went on to discuss- But the legal title issue was argued to the district court, and the district court didn't say that the issue had been waived, right? The legal title issue was raised for the first time in Pitt's reply brief. And you argued that it wasn't properly raised? That's correct. And the district court didn't say anything about waiver, right? The district court didn't say anything about that. We would submit that because it didn't say anything about legal title at all, it didn't consider the issue because it deemed it to be waived. But there's no requirement that the district court had expressly addressed the issue of waiver for this court to find that the standing issue was waived by three different reasons. First, because Pitt didn't raise the legal title issue to the special master. Second, because Pitt didn't object to the special master's ruling. And third, Pitt waited until a reply brief to raise its current argument, legal title, to the district court. So there are three different grounds for waiver. And these facts also show that its legal title argument is something that it's come up with after the fact. It argued all substantial rights before the special master. That didn't work. So it came up with a different argument to try with a different court. And that constitutes waiver, and it also supports the argument that, or it supports the district court's finding that based on the entire course of conduct leading up to the lawsuit, when Pitt filed this lawsuit, it knew that Carnegie Mellon was a joint owner. And it was the facts about knowledge and violation of a court order and prejudice to the defendant that led the district court to exercise its discretion to dismiss with prejudice. And it's for that reason that we asked this court to uphold the district court's dismissal with prejudice. I want to mention a case that Pitt identified in its reply brief before this court. It's Alvin v. Suzuki. And it is a Third Circuit decision that Pitt cited for the principle that a district court may not dismiss a case with prejudice solely based on case management concerns. This Alvin case actually supports the district court's dismissal with prejudice because on page 121 of the opinion, it said, quote, there was no evidence of bad faith delay or prejudice or any other reasons justifying the denial of leave to amend. That distinguishes it from our situation and supports the dismissal with prejudice in our case because there were findings on those points by the district court in this case. There are some important policies that support the district court's dismissal with prejudice here. First of all, there's a general policy that trial courts need to be able to control their schedules. They need to be able to impose a scheduling order that's going to govern both parties' behavior in the case and both parties conform their conduct to that behavior or to that scheduling order. So when one party deviates from it, it prejudices the other party. It prejudices the court in its ability to control the case and justifies, depending on the circumstances, a dismissal with prejudice. There's also the fact that this court has spent the last 20 years carefully prescribing what the rules of standing are. And we've seen in case after case that parties don't get it right. It wastes the court's time. It wastes the party's time. It creates collateral proceedings. And in a case where you have a district court finding that a party knew about the co-owner at the start of the case and still failed to bring it in at that point in time, you have a violation of a court order. You have a finding by the district court that there were tactical reasons behind the decision. In these cases, we need to give the district court's discretion. The district court said it may have. No, it said it was a tactical decision. It said it may have been for one reason or it may have been for another reason. But it said it was a tactical decision. If there are no further questions. Thank you. Thank you, Your Honor. I mentioned the provision in the guidelines that gave CMU the right to change the tech transfer office. That's at page A499, paragraph F1. What about this license at 514? Well, it was a license that wasn't added into. My reaction to it was it's like a commercial situation where if you know another party has an equitable interest in a license, you'll get that party to join the contract even if they don't claim legal title. That is, it's careful planning by a lawyer to make sure that anybody who has an interest enters into the transaction. But it's a different situation than litigation. But this was signed, right? The 521 there. With Electra? Was it? Pardon me? It was signed. This was signed. All right. But I don't think there's not an assertion in there that CMU owns legal title. I think it's more a situation of a commercial lawyer protecting the other side's interests by adding anybody who may have a claim. On the issue that counsel just argued about no objection, actually if you look at never argued at the district court level that we failed to file an objection to the special master's report. And I think it's correct that the significant fact about the waiver argument is the district court focused on all of the arguments and addressed them. I'd like to pull back for a minute on two things. That is, the relationship between the commercial enterprises and litigation and the issue that has now been put to pit about forfeiting all of its rights because it didn't join CMU. The point on the commercial situation is that we have parties to a joint venture agreement. It's different than the employment-employer relationship. Joint venture agreement, they want to structure their business as best they can to do it the best way they'd like to do it. And if they structured it in a way that each party understood that pit had title to the patents, each party understood that pit was going to manage the patents, Carnegie Mellon had an equitable interest in the patents and could have stepped in and changed the management under the guidelines. I don't think the court should step into that transaction and undo it for the benefit of Varian if it's a legitimate business enterprise that Carnegie Mellon and pit had planned and a legitimate method to manage their business. Second point is that if pit and Carnegie Mellon made a mistake in failing to join Carnegie Mellon at the filing of the complaint and Varian identified this issue on Carnegie Mellon as a party, and the court never ultimately addressed the issue of what was wrong, what was so unfair about allowing pit to amend to add Carnegie Mellon. It was past the deadline for amending to add a party, but the deadline was only a couple of weeks. Rule 19 says you must allow them to add a party. And if you try to identify what's the harm that Varian's talking about here, what sits at the bottom of the case? Are you telling us that if we were to decide the prejudice issue in your favor, we don't have to reach any of these other issues? I think pit and Carnegie Mellon would be very disappointed if the court decided that Carnegie Mellon was a co-owner of the patent and not recognized the value of the transactions the parties had structured. So I'd be happy to get a result. I'm not understanding that. We're not here to decide what rights necessarily inter-say in equitable terms between these parties. The question is in terms of disposing of this case, you raise a number of issues. If we were to hypothetically agree that the dismissal with prejudice was not proper and that it should have been without prejudice, does that resolve the case? Do we need to reach the other issues? It resolves the case. You don't need to reach the other issues, but it leaves standing the idea that Carnegie Mellon and pit are co-owners of the patent. I'm not sure that does well for the jurisprudence of the court and for universities and other companies who do joint ventures, but it's correct. Making briefly the point about what's the harm to Varian of this whole process, and you can actually identify that harm, the judge didn't say it. He talked about it being unfair to Varian, but he didn't really identify what's unfair. But Varian at page A620 in their December 12, 07 brief on the rule 19 motion talked about the harm being inability to get interrogatory answers from Carnegie Mellon, not being able to depose Carnegie Mellon as a party, not getting broad document production from a party. Those don't seem to be the types of harm to a party that should say that the court should dismiss the matter with prejudice and take away from both pit and Carnegie Mellon the Thank you, counsel. The case is submitted.